## AMUNDSON v. FOLSOM.

(Circuit Court of Appeals, Eighth Circuit. November 25, 1914.)

No. 4156.

FRAUDULENT CONVEYANCES ☞108—TRANSACTIONS SUBJECT TO ATTACK BY CREDITORS.

A firm, consisting of a father and son, and each of its members, were insolvent, and its creditors were pressing for payment. Defendant was the president of a bank, which had received for collection many drafts on the firm, most of which were returned unpaid, and he was also an indorser on a note of the firm. The father, at a meeting of the creditors, agreed to take an inventory in support of his claim that the firm had more goods than the creditors admitted, but immediately sold his interest in the firm property, worth over $10,000, to the son for his equity in real estate worth about $350. The son immediately traded the stock and fixtures to defendant for a farm belonging to defendant's brother, title to which was held by the bank as security for a debt; the note on which defendant was an indorser being also deducted from the value of the stock and fixtures. Though in connection with this trade an inventory was taken, the representative of the creditors was excluded. There were no buildings on the land conveyed to the son, but in the month of January he moved thereon a building formerly used as a boathouse, and early in February occupied it and claimed the land as a homestead. Held that, though each transaction may have been lawful in itself, findings were justified that the various transactions were parts of a plan to hinder, delay, and defraud the creditors, and to enable the son to secure from the partnership assets a personal exemption in the impending bankruptcy proceedings, which, except for the dissolution of the firm, he could not have obtained, and that defendant, knowing the situation, secured a preferential payment of the note on which he was indorser, and aided the debtors in accomplishing their design.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 333–336; Dec. Dig. ☞108.]

Appeal from the District Court of the United States for the District of South Dakota; James D. Elliott, Judge.

Action by N. J. Folsom, as trustee in bankruptcy of Davis & Son and others, against Albert Amundson. From a decree for plaintiff, defendant appeals. Affirmed.

George M. Caster, of Lake Andes, S. D., for appellant.
P. G. Honegger and H. S. Snyder, both of Sioux Falls, S. D. (Bailey & Voorhees and T. M. Bailey, all of Sioux Falls, S. D., and Sears & Snyder, of Sioux City, Iowa, on the brief), for appellee.

Before HOOK and CARLAND, Circuit Judges, and REED, District Judge. ●

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

HOOK, Circuit Judge. This suit was brought by Folsom, as trustee in bankruptcy of the partnership estate of Davis & Son, and the individual estates of Ernest Davis and Ernest B. Davis, the members of the firm, against Albert Amundson, to set aside a transfer to him of a stock of merchandise and fixtures as having been made with intent to hinder, delay, and defraud creditors (Bankr. Act July 1, 1898, c. 541, § 67e, 30 Stat. 564 [Comp. St. 1913, § 9651]), and to recover the property or its value. The case was referred to a master, who made exhaustive findings of fact in favor of the trustee. The trial court approved the findings and rendered a decree against Amundson, the defendant, for the value of the property and interest. This appeal followed.

The trial court and master found that the scheme of Davis & Son, in which the defendant knowingly aided and participated, was to put the partnership assets so far as they could beyond the reach of their mercantile creditors. The principal facts found were as follows:

The firm of Davis & Son, in which Ernest Davis and Ernest B. Davis, his son, were equal partners, conducted a general merchandise business in the town of Lake Andes, S. D., for several years prior to December 29, 1911. At the latter date their stock and fixtures were worth $10,305, their outstanding credits not exceeding $1,200, and all other property not more than $200. Ernest B. Davis, the son, individually owned a house, with two lots, in the town of Lake Andes, subject to a mortgage of $800, leaving an equity of not more than $350. The firm and also the partners individually were insolvent, and had been so for some time. Creditors were pressing for payment of their claims. The amount of their indebtedness is approximately indicated by the fact that claims aggregating $11,729 were proved and allowed in subsequent bankruptcy proceedings. In addition, Davis & Son were also indebted on an unsecured note for $3,000 given a local bank, of which the defendant was president. A note for that amount had been given in July, 1911. The defendant and the cashier of the bank indorsed it personally, and the bank indorsed it without recourse and discounted it in Iowa. When it matured October 7, 1911, it was not paid by Davis & Son, but was renewed, indorsed in the same way, and again discounted. The maturity of the renewal note was January 7, 1912. During the year 1911, and until the latter part of December, many drafts drawn by creditors on Davis & Son came to defendant's bank for collection. Most of them were returned unpaid. In December of that year creditors became insistent. On December 28th, Ernest Davis, the father, attended a meeting with some of the creditors in Sioux City, Iowa, where the condition of the firm was discussed. He claimed that the firm had more of a stock than the creditors thought it had, and it was agreed that an inventory should be taken to see whether his claim was correct, and that to assist in the work they would send a representative to Lake Andes the following day.

Davis then returned home, arriving the evening of December 29, 1911. He went at once to the store, and that night verbally agreed with his son to dissolve the firm and to sell him his half interest in the

firm property for the equity in the son's house and ground, which, as already stated, was worth not more than $350. The following forenoon, December 30th, a written contract of dissolution and sale was accordingly drawn and executed. In the same forenoon Ernest B. Davis, the son, then claiming to own all the firm property, traded the stock and fixtures to defendant for 140 acres of land belonging to a brother of the latter, the legal title to which was in the bank as security for a debt. An inventory was to be taken of the stock and fixtures, and from the value so ascertained the amount of the Davis partnership note, on which defendant was an indorser, was to be deducted. Ernest B. Davis was to take the land at $75 per acre, but was to give the bank his note and mortgage for $4,000 on account of the debt of defendant's brother. The papers—bill of sale, deed, and mortgage—were at once drawn and left in the possession of the cashier of the bank. They then worked at the inventory December 30th and 31st and January 1st, being Saturday, Sunday, and New Year's day, and into the nights of those days. The representative of the creditors arrived Saturday evening, as agreed with Ernest Davis at Sioux City, but he was not admitted to the store. The inventory was completed, and the papers in the trade were exchanged Tuesday, January 2, 1912. The value of the stock and fixtures was determined to be $10,305. After deducting therefrom $3,075, the principal and interest of the Davis note, on which defendant was indorser, there remained $7,230. The land at $75 per acre (the trial court and the master found it was worth but $70) came to $10,500, leaving a balance of $6,500, after deducting the amount of the note and mortgage given by Ernest B. Davis to the bank. Defendant then gave Ernest B. Davis his note for $730, the difference between these net sums. He put another similar stock into the store, and thereafter sold from the intermingled goods at retail. On January 4, 1912, creditors commenced involuntary bankruptcy proceedings against Davis & Son and the partners individually, and adjudication followed January 24th. There were no buildings on the tract of land conveyed to Ernest B. Davis. In the latter part of the month of January he moved there over the ice on the lake a structure formerly used as a boathouse, and early in February he occupied it and claimed the land as a homestead.

The trial court and the special master found from the evidence that the various transactions were steps in a single plan designed to hinder, delay, and defraud the creditors of Davis & Son, that the dissolution of the firm and the transfer from the father to the son were intended only to give the latter an apparent personal title to partnership assets, to enable him to secure a personal exemption which otherwise the law allowed neither of them, and that defendant, knowing the situation, not only secured a preferential payment of the note on which he was an indorser, but aided the Davises in accomplishing their own design.

No useful purpose would be gained by reciting the facts in greater detail or pointing out the inferences reasonably to be drawn from specific facts established. We think the evidence fairly sustains the findings of the master and the confirmation of the court. It is too

narrow a view to regard each step in the transaction separately and independently. It may be true, as argued, that creditors of a partnership merely as such have not a lien on partnership assets, as distinguished from an equity in their administration, or that the members of an insolvent firm may lawfully sever their relation, and one sell his interest in the firm property to the other, or that a debtor in failing circumstances can turn business assets into exempt property and hold it, or that one may lawfully purchase a stock of goods in bulk from another, or, finally, that it is not in itself fraudulent for an insolvent debtor merely to make a preferential transfer, or for his creditor to receive it. But all such things, especially when in close consecutive association, are to be considered, with what else appears, in determining whether the result was the consummation of a preconceived purpose to hinder, delay, or defraud creditors. As in the case of a preference (Van Iderstine v. Nat. Discount Co., 227 U. S. 575, 582, 33 Sup. Ct. 343, 57 L. Ed. 652), the other acts recited are often incidents or methods of a scheme to defraud. Transactions apparently innocent when separately regarded may take on a different significance when seen in their true connection with others. And it is not always safe to venture a prohibited course on a mosaic of sound, but unrelated, rules of law. The dissolution of Davis & Son and the transfer of the firm property to the son was by itself an ordinary occurrence and seemingly lawful; but in view of what preceded and followed, and the doubtful character of the consideration, the reasonable inference is that, knowing failure was at hand, and that under the laws of the state neither partner had an exemption in partnership assets (In re Abrams [D. C.] 193 Fed. 271, 273), they sought a color or appearance of individual title to enable them to evade their creditors.

Counsel invoke the indulgence with which courts regard the homestead right (In re Letson, 84 C. C. A. 582, 157 Fed. 78), but it may be pushed to an unconscionable extreme. The right is not upheld when secured by the fraudulent conversion of nonexempt assets. The case here is materially different from Sargent v. Blake, 87 C. C. A. 213, 160 Fed. 57, 17 L. R. A. (N. S.) 1040, 15 Ann. Cas. 58. There it was affirmatively found that the dissolution of the firm was without fraudulent intent, and that the subsequent preference of the individual creditor was neither fraudulent nor voidable. We agree with the trial court that the defendant here knew of the insolvency and the purposes of the Davises, or, which is legally equivalent, willfully closed his eyes to information within his reach. By indorsement of their note he was their creditor (Kobusch v. Hand, 84 C. C. A. 372, 156 Fed. 660, 18 L. R. A. [N. S.] 660), and to obtain a payment of the note, which was unsecured, except by his indorsement and that of the cashier of his bank, he knowingly aided them in what they set out to accomplish. The trial court correctly saved defendant the right to prove a claim on the note in the bankruptcy proceedings.

We have considered the other questions presented, and think no error was committed with respect to them.

The decree is affirmed.